IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

JENNIFER YOUNG, as the :
Administratix and personal :
representative of the estate of :
JERMAINE McBEAN, :
 :
   Plaintiff, :
 :
v.      :    Civil Action No.
 :
        :    JURY TRIAL DEMANDED
PETER PERAZA, individually, and :
in his official capacity as a Deputy :
Sheriff with the Broward County, FL :
Sheriff's Office; :
 :
 :
SHERIFF SCOTT ISRAEL, in his :
official capacity as Sheriff of :
Broward County, FL, :
 :
BROWARD COUNTY, FLORIDA :
 :
   Defendants. :

## COMPLAINT

### INTRODUCTION

   This action is brought to seek redress and some measure of justice from the

defendants for the tragedy they caused on July 31, 2013, when Defendant Peter

Peraza ("Peraza"), a Deputy Sheriff with the Broward County Sheriff's Office

("BSO"), intentionally, recklessly, and in cold blood shot to death a beloved,

dynamic, thirty-three year old African-American Information Technology

Engineer, Jermaine McBean ("McBean"), near his home, causing him tremendous

conscious pain and suffering before his death, and leaving his family, friends, and

co-workers with an unimaginable and irreplaceable loss.  Mr. McBean's family

prays that through this lawsuit, the truth about the unlawful homicide of their son

and brother Jermaine by a Broward County Sheriff's Deputy and the concerted conspiracy to cover it up will be fully exposed and that a process will be put into place to lessen the chances that such a thing could happen to anyone else in the future.

The case is not just about the senseless homicide of Jermaine McBean by Deputy Peraza. It is also about the Broward County Sheriff's Office's deliberate indifference to Mr. McBean's urgent medical needs, denying him medical care while he lay dying from Defendant Peraza's bullets. Perhaps most shockingly, it also is about the concerted cover-up campaign that followed, including perjury by Defendant Peraza and other Broward County Sheriff's Office officers sworn to serve the public, designed to conceal the true facts surrounding Mr. McBean's death. After Peraza killed Jermaine, Jermaine's body was cut up and his organs were removed, without any notice to his family and without permitting them any opportunity to object or to have an independent expert or other observer participate in the autopsy that was performed.

The Defendants in this case and other BSO officers, sworn to uphold the law and serve every segment of the community, regardless of race, conspired among themselves to conceal the true facts surrounding the homicide of Jermaine McBean by Defendant Peraza in order to prevent the public from ever learning the truth and to prevent Mr. McBean's family from seeking justice and redress for what happened to their beloved son and brother.

Their conspiracy to white-wash and cover-up Defendant Peraza's actions

and the conduct of the other law enforcement officers involved included a sham "investigation," ignoring and discouraging witnesses from telling the truth, tampering with evidence and obstructing justice, preparing reports with false information and material omissions, providing false information to the McBean family, and putting Peraza back on the street, with a gun, almost immediately after he killed Mr. McBean, without any meaningful investigation into his actions and without any further training.

To top it all off, in perhaps the most arrogant effort to cover-up the unlawful killing of Jermaine McBean: less than two months after Defendant Peraza killed Jermaine, Defendant Peraza, Sgt. Richard Lacerra ("Lacerra"), and Lt. Brad Ostroff ("Ostroff") were honored by Defendants Sheriff Scott Israel ("Israel") and Broward County with special "prestigious" awards for their "outstanding contributions" and "meritorious service."

Peraza and Lacerra were given the BSO's "Gold Cross Award," based on a memo from Ostroff that is filled with outright lie after lie and complete mischaracterizations of the scenario.  It falsely casts Peraza and Lacerra as heroes who took action in the face of great risk to civilians, while omitting entirely from the story the true facts that when Peraza killed Jermaine by recklessly and unlawfully firing his weapon multiple times and creating the only real danger at the scene, Jermaine was simply walking to his own home with an unloaded pellet gun he had every right to carry, listening to music on his headphones, unable to hear anyone's "command" and posing no danger to anyone.

3

The cover-up campaign goes all the way to the highest ranks of the BSO. Defendants Israel and Broward County actively participated in this cover-up scam, ratifying and rewarding the unlawful and outrageous underlying conduct and subsequent cover-up. Defendant Israel proudly celebrated the awards with Defendant Peraza and the others at a ceremony held at the African-American Research Library - honoring these men in that forum for their role in the unlawful and outrageous cold-blooded homicide of this beloved, young, unarmed, African-American man, Jermaine McBean.

Fortunately, the case also is about courageous witnesses who were willing to stand up and be counted and without whom the truth about the homicide of Jermaine McBean and the cover-up by the BSO that followed likely never would have been exposed.

A full and fair airing of the facts through this case is important for reasons beyond just this case. This case reflects a long-standing pattern and practice of conduct, including criminal conduct, by Broward Sheriff's Office deputies involving the illegal use of deadly force. It also reflects a long-standing pattern and practice of allowing cases in which a BSO deputy kills a civilian to linger for years without any meaningful investigation, follow up with witnesses, or presentation to a grand jury and without any punitive or remedial action ever.

## JURISDICTION AND VENUE

1.    This action arises under the authority vested in this Court by virtue of 42 U.S.C. §§1983 and 1985, with jurisdiction over this action pursuant to 28 U.S.C. §

4

1331 (Federal Question); 28 U.S.C. §1343 (a)(3) (Civil Rights Action), and 28 U.S.C. §1367 (a) (Supplemental Jurisdiction).

2.      This Court is an appropriate venue for this action pursuant to 28 U.S.C. § 1391(b).

## PARTIES

3.      Plaintiff JERMAINE MCBEAN is dead.  At the time he was shot down and killed by Defendant Peter Peraza, he was a 33 year old African-American man, with advanced academic degrees, working as an Information Technology Engineer at a prominent Fort Lauderdale advertising company, and he was loved by his family and his co-workers.  His estate is represented herein by Ms. Jennifer Young, Jermaine's mother, the duly appointed administratrix and, therefore, the appropriate personal representative of the deceased, Jermaine McBean, for purposes of prosecuting this action.  At all times relevant to this case, Jermaine McBean was an adult resident-citizen of Broward County, Florida, residing in Oakland Park, Florida, within Broward County, Florida, in the Southern District of Florida, where all events relevant to this action took place.

4.      Defendant PETER PERAZA is and at all times relevant to this action has been, upon information and belief, an adult resident-citizen of Broward County, Florida, employed now and at all relevant times, as a Deputy Sheriff with the Broward County, Florida Sheriff's Office.

5.      Defendant SHERIFF SCOTT ISRAEL, upon information and

belief an adult resident-citizen of Broward County, Florida, is and has been at all times relevant to this lawsuit, the Sheriff of Broward County, Florida and, as such, the top policy maker and final authority within the Broward County Sheriff's Office, with full supervisory authority over Defendant Peraza, each person identified herein as an employee of the BSO and all other Broward County Sheriff's Office personnel, and over their training, hiring, retention, chain of command, supervision, disciplining, and firing.  He and his authorized spokesperson have spoken at press conferences concerning the killing of Jermaine McBean and have misled the public as to the true facts surrounding Jermaine's death.  He was a final decision-maker in permitting Peraza to return to duty on the street with a weapon and with no meaningful additional training just days after Peraza unlawfully killed Jermaine McBean.

6.      Defendant BROWARD COUNTY, FLORIDA is a County and political subdivision of the State of Florida, duly organized and existing under Florida law. At all times relevant to this lawsuit, all other defendants and all BSO employees were employed by this Defendant.

7.      All defendants and all others identified herein as having been employed by the BSO acted under color of state law in all regards and at all times relevant to this action.

8.      Defendants and all others identified in this Complaint as having been employed by the BSO were acting as agents, employees, or servants for the BSO and Broward County, Florida, and within the line and scope of such capacity at all

times relevant to this cause.

## OTHER DIRECTLY RELEVANT PERSONS

9.      There are other persons who, while not parties to this action at this time, are also highly relevant to the events described herein.  They include, but are not limited to the following:

A.  RICHARD LACERRA is and at all times relevant to this action has been, upon information and belief, an adult-resident citizen of Broward County, Florida, employed now and at all relevant times, as a Sergeant with the Broward County Sheriff's Office, with supervisory and command authority over deputies within the Broward County Sheriff's Office.  He was present at the scene and had a supervisory duty and authority over Defendant Peraza when Peraza shot and killed Jermaine McBean.

B.  BRAD OSTROFF is and at all times relevant to this action has been, upon information and belief, an adult-resident citizen of Broward County, Florida, employed now and at all relevant times, as a Lieutenant with the Broward County Sheriff's Office, with supervisory and command authority over deputies and Sergeants within the Broward County Sheriff's Office.  He was present at the scene and had a supervisory duty and authority over Defendant Peraza when Peraza shot and killed Jermaine McBean.

## FACTS

### The Events Surrounding the Homicide of Jermaine McBean

10.    At all times relevant to this lawsuit, Jermaine McBean was living in an

7

apartment in the Green Tree Apartments complex, located at 5201 North Dixie Highway, in Oakland Park, Florida, within Broward County, Florida.

11.     Jermaine held college degrees, including a Bachelor's degree and a Master's degree and at all times relevant to this lawsuit he was employed as an Information Technology Engineer at Zimmerman Advertising, a company with headquarters in Fort Lauderdale, Florida, where he was a hard-working and beloved employee.

12.     On July 31, 2013, Jermaine walked a few blocks from his home to a pawn shop, where he lawfully bought an unloaded air rifle, which he understood to be a BB gun.

13.     Under Florida law and federal law, no license is required to purchase or openly carry an air rifle and it is not classified as a firearm or as a weapon.

14.     The air rifle Jermaine bought and was carrying could not fire bullets and was not loaded with BBs, pellets, or anything else and Jermaine knew it was not loaded.

15.     After buying the unloaded air rifle, Jermaine walked with it directly toward his nearby home, carrying it in a plastic bag until the bag blew off during his walk home.

16.     Jermaine was walking with the unloaded air rifle toward his home, with ear buds in each ear, connected to his iPhone, blocking out the noise on the street as he listened to and sang along with music during his walk home.

17.     At no time while carrying the unloaded air rifle home, did Jermaine in any way hold the air rifle in a threatening manner or threaten any person with it.

18.     In walking home from the pawn shop with the unloaded air rifle, after stopping to wait for a green walk signal, Jermaine passed through a major intersection that was, at the time, being heavily traversed.

19.     In walking home from the pawn shop with the unloaded air rifle, Jermaine passed a bank, many businesses, and many cars that were driving on the street with passengers in them.

20.     The walk between Jermaine's home and the pawn shop where he bought the unloaded air rifle is approximately a 10-15 minute walk for a person walking at a normal pace, as Jermaine was.

21.     Shortly after Jermaine left the pawn shop with the unloaded air rifle on his walk home, a motorist called the Broward County emergency services 911 line and spoke with a dispatcher.

22.     During his 911 call, the motorist reported seeing a man, who turned out to be Jermaine, walking down the street and passing near his car, carrying what the motorist at first referred to as a gun or a rifle.

23.     During this same 911 call, however, this same motorist later expressly advised the dispatcher that, on further consideration, the item the man (Jermaine) was carrying might not have been a real gun and he questioned whether he even should have called 911 under such circumstances.

24.     During the 911 call, the motorist emphasized to the dispatcher that the man to whom he was referring (Jermaine) was not acting in any kind of threatening manner; rather he was just walking down the street carrying the item.

25.     Another citizen called 911 to report seeing Jermaine walking in the same area and during her call told the Broward County dispatcher at least twice that the "gun" Jermaine was carrying might be a "BB gun."

26.     Defendant Peraza and Lacerra saw Jermaine walking on the sidewalk by himself with the air rifle touching the ground, as if being used like a cane or walking stick, his hands nowhere near the trigger and they had adequate opportunities to approach and stop him without in any way endangering themselves or anyone else; yet they chose not to stop, confront, or question him while he was on the sidewalk, with no one else nearby, and before he entered his apartment complex.  Defendant Lacerra expressly ordered that Jermaine not be stopped or approached.

27.     Notwithstanding the fact that during his walk home Jermaine was passing many places of business, cars, and other potential targets for anyone intent on harming another, instead of confronting or stopping Jermaine, to ask him questions or to direct him to drop his air rifle, the Defendants set up a perimeter, blocks ahead of where Jermaine was walking.

28.     A Broward County Sheriff's Office substation is located just a couple of blocks from where the 911 operator was told Jermaine was walking and the street on which Jermaine was walking is regularly patrolled by Broward County Sheriff's Office patrol cars.

29.     When Jermaine reached the apartment complex where he lived, he turned in and walked toward his apartment, with Peraza, Lacerra, and other BSO personnel,

including a supervisor, allowing him to walk freely into the apartment complex, instead of stopping him on the sidewalk before he entered the apartment complex.

30.     Defendant Peraza, Lacerra and Ostroff followed behind Jermaine as he walked toward his apartment.

31.     Defendant Peraza was behind Jermaine on the left, Sgt. Lacerra was behind Jermaine on the right, and Lt. Ostroff was behind Jermaine in the middle of the other two following behind Jermaine as he walked toward his apartment.

32.     At all times when Jermaine was walking in his apartment complex, toward his apartment, with Lacerra, Peraza, and Ostroff behind him, he was carrying the air rifle cradled behind his head, parallel to the ground, arms wrapped around the air rifle, with one arm on the barrel of the air rifle and one arm on the stock of the air rifle.

33.     At no time did Jermaine have his hands on or near the trigger of the air rifle that he was carrying behind his head parallel to the ground and at no time did Jermaine hold, carry, or point the air rifle in a shooting position.

34.     At all times when Jermaine was walking toward his apartment, with Peraza, Ostroff, and Lacerra behind him, Jermaine had ear buds in his ears, connected to his iPhone.

35.     Defendant Peraza, Ostroff, and Lacerra continued to follow behind Jermaine as he walked to his apartment, with Peraza on the left, Ostroff in the middle, and Lacerra on the right until they were within close proximity to Jermaine, still behind him.  Each of these BSO officers had his gun drawn and pointed at

11

Jermaine from behind, ready to shoot Jermaine.

36.     There was no indication that Jermaine was aware that he was being followed by any of the defendants or that they were near to him - indeed the officers later said it appeared as if Jermaine did not hear them or was ignoring them - and he continued walking toward his apartment with his ear buds in, the air rifle cradled behind his neck, parallel to the ground, arms wrapped around it, and his hands nowhere near the trigger.

37.     Jermaine at all times was walking toward his apartment, lawfully carrying his unloaded air rifle which he lawfully had just purchased and lawfully was carrying, cradled behind his head in a non-threatening manner.

38.     Jermaine's actions at all times relevant to this lawsuit were lawful and at no time relevant to this lawsuit did Jermaine engage in any unlawful conduct.

39.     As the Defendants approached Jermaine from behind, in the formation described herein in ¶¶ 31 and 35, they came within close proximity behind him and Jermaine just kept walking toward his apartment and did not turn around.

40.     As Peraza, Ostroff, and Lacerra followed behind Jermaine, upon information and belief, Defendant Peraza said, "Drop your weapon.  Drop your weapon."

41.     At the time Peraza, Ostroff, and Lacerra approached Jermaine and Peraza called out, Jermaine had ear buds in each ear with wires visibly protruding from each ear bud and these officers knew or should have known that Jermaine had ear buds in his ears and could not hear Peraza or any other officer.

42.     At about the time Peraza said the words referred to herein at paragraph 40, upon information and belief, Jermaine could see some kind of a commotion in front of him, with people pointing at him and behind him.

43.     After Peraza said the words referred to herein at paragraph 40, when Jermaine saw the commotion in front of him, Jermaine began to turn around toward his right to see what was behind him.  At all times the air gun Jermaine was carrying remained on his shoulders and in a non-threatening position with his hands away from the trigger.

44.     As Jermaine started to turn to see what was happening behind him, the air rifle remained behind Jermaine's head.

45.     Jermaine's hands were nowhere near the trigger of the air rifle that he continued to hold with his arms draped over it behind the back of his neck as he began to turn to his right to see what, if anything or anyone, was behind him.

46.     Jermaine held the air rifle behind his head in a position from which no reasonable person objectively could have believed that Jermaine could have or would have fired it, even if it had been loaded.

47.     As Jermaine started to turn around, he started turning from left to right, meaning he would have turned first toward Lacerra, then toward Ostroff, and only lastly toward Peraza.

48.     Ostroff and Lacerra had many years of experience as law enforcement officers operating in the field and as supervisors.  Peraza had spent most of his career as a jail officer, and had only a year and a half of experience on the street.

49.    As Jermaine began to turn around to see what was behind him, Lacerra,

Ostroff and Peraza all had their guns loaded, drawn, pointed toward Jermaine, and

ready to fire at him from behind.  Yet despite the fact that Jermaine turned first

toward Lacerra and then toward Ostroff, and only lastly toward Peraza, neither of

the more experienced officers, Lacerra or Ostroff, fired his weapon.

50.  Peraza, on the other hand, with only about a year and a half of experience on

the street, fired his weapon at Jermaine at least three times, striking Jermaine twice

just as Jermaine began to turn around to see what people were pointing at behind

him.

51.    In shooting Jermaine, Peraza acted intentionally, and/or recklessly,

unlawfully, and/or in a manner that was outrageous, malicious, wanton, reckless,

grossly negligent, completely avoidable, and which reflected a callous and

complete disregard for the sanctity of human life and the law regarding when

deadly force constitutionally can be used, and Peraza violated Jermaine's rights

under the United States Constitution and applicable provisions of the State of

Florida's Constitution and Florida law.

52.    Peraza's unlawful and unjustifiable shooting of Jermaine McBean

proximately caused Jermaine to suffer tremendous pain and agony, and great fear

and apprehension in contemplation of his impending death, while Jermaine lay on

the ground screaming in pain and bleeding to death and until he ultimately died

from Peraza's gunshots.

53.    Defendant Peraza killed Jermaine McBean by shooting him.  In doing so,

Peraza committed a homicide.  It was an unlawful homicide.

54.    The shooting by Defendant Peraza, described above,  proximately and inexorably caused Jermaine McBean's death, following his terrible pain, suffering, fear, and apprehension of his impending death.

55.    Jermaine was heard screaming loudly in agony after Peraza shot him.

56.    Prior to and instead of shooting Jermaine, if the defendants wished to subdue, capture, arrest, or otherwise stop Jermaine from walking toward his apartment, they had several alternatives of non-deadly force at their disposal which could have and would have adequately allowed them to subdue, capture, arrest, or otherwise stop Jermaine without hurting him, certainly without killing him, and without causing any risk of harm to themselves or to any other person.

57.    At no time did Jermaine pose any imminent risk of death or serious bodily injury to any of the defendants, himself, or any other person; nor would any reasonable, objective observer in the defendants' position have believed otherwise.  As the deputies knew and should have known, Jermaine had no idea they or any law enforcement officer was behind him or wanted him to stop walking toward his home with his unloaded air rifle.

58.    Immediately after Defendant Peraza shot Jermaine multiple times and Jermaine fell to the ground, Sgt. Lacerra walked over to Jermaine as Jermaine lay on the ground in agony and Lacerra kicked the air rifle away.  Jermaine turned to Lacerra, looked at him with bewilderment and softly said to him, "It was only a BB gun."  Jermaine's ears with the ear buds in them and the white wires extending

from his ears and down his face were clearly visible to Lacerra, Peraza, and all other officers on the scene, especially in contrast with his brown skin.

59.     After Defendant Peraza shot Jermaine multiple times, BSO officers, including supervisors Lacerra and Ostroff, left Jermaine lying on the ground, screaming loudly in great agony, bleeding from the wounds Peraza inflicted on him, in great pain, suffering greatly, in tremendous fear of his impending death, and breathing loudly and with great labor and difficulty.

60.     When an Emergency Services ("EMS") unit finally arrived on the scene, Lt. Ostroff expressly ordered that if Jermaine were dead already, the EMS personnel should leave him lying there on the ground.

61.     Lacerra recognized that Jermaine needed immediate first aid medical assistance if he were to have had a chance to survive from Peraza's bullets; yet he and the other BSO employees refused to permit a registered nurse who came to the scene to render medical assistance provide any medical assistance.

62.     A witness whose apartment was located right above the site where Peraza killed Jermaine came to her window overlooking the site, saw Jermaine lying on the ground below her window with blood pouring from his chest, heard his labored breathing, determined that she could help him survive, and identified herself to Peraza and the other BSO officers present as a registered nurse and told them that she wanted to provide first aid medical assistance to Jermaine.

63.     Peraza and the other BSO officers rejected express offers of medical assistance for Jermaine from this trained registered nurse who was at the scene and

who, immediately after Peraza shot Jermaine, saw Jermaine lying on the ground, bleeding profusely, breathing loudly and with great difficulty and labor, and identified herself to defendants as a registered nurse and who told defendants that she wanted to help and could help Jermaine with respect to his medical needs.

64.   Peraza and the other BSO officers told this registered nurse not to come down to the scene from her apartment.

65.   The registered nurse could not stand to see and hear Jermaine suffering and she believed she could provide critical medical assistance to him; so she came downstairs from her apartment to the scene, notwithstanding the BSO officers' directive to her to stay in her apartment.

66.   Within seconds, the registered nurse was downstairs at the scene where Jermaine was lying on the ground and she again asked to be permitted to provide critical medical assistance to him, explaining that she could provide vitally needed medical care to Jermaine to help save his life and/or ease his pain and discomfort.

67.   Defendants again told the registered nurse that they would not permit her to assist Jermaine, telling her to go back to her apartment.

68.   The registered nurse told defendants that they did not want to allow her to assist Jermaine because they knew that if she did and he survived, he would expose what they had done to him, including Peraza's unlawful, unprovoked, and unjustified shooting.  She also told the BSO officers on the scene that Jermaine probably never heard them call out to him and never knew they were behind him because he had ear buds in his ears.

17

69.     The BSO officers ordered the registered nurse to leave the scene and she did, returning to her apartment overlooking the scene.

70.     According to public records produced under Florida law by the State Attorney's Office on written demand by the McBean family, all BSO employees omitted this encounter entirely from their oral and written reports concerning this incident and the investigative file provided to the State Attorney's office makes no reference whatsoever to it.  These clearly were facts material to the shooting and its aftermath and which should have been included in their investigative reports.

71.     Peraza and the other BSO officers were deliberately and callously indifferent to Jermaine's critical medical needs and/or deliberately denied him medical attention, in the hope that he would die and would not be able to tell the authorities what Peraza did to him.  Jermaine did, in fact, succumb to the wounds from Peraza's bullets and, after excruciating pain and suffering, Jermaine dies as a proximate result of Peraza's shooting.

**Defendants' Cover-Up, Sham "Investigation" and Obstruction of Justice**

72.     After Defendant Peraza shot and killed Jermaine, the Defendants and others, including, but not limited to, Lacerra, Ostroff, and BSO Detective Efrain Torres ("Torres") and other law enforcement officers and supervisory personnel employed by the BSO began a campaign designed to cover-up the true facts surrounding Peraza's shooting of Jermaine and conspired together with each other for that unlawful purpose, knowing they had a duty to truthfully reveal and report all relevant facts.

73.   This cover-up campaign and conspiracy continues through today and has included, but has not been limited to, deliberately lying about the relevant facts, deliberately lying, misleading, and omitting relevant facts under oath, destroying and/or tampering with directly relevant evidence, attempting to dissuade witnesses from coming forward and from telling the truth about the relevant events, ignoring eyewitness statements in reporting on the BSO's "investigation," making false statements to the media, falsifying reports generated in the purported investigation of the events surrounding the shooting and omitting material facts from such reports, along with other illegal and inappropriate acts and omissions.

### Specific Examples of the Cover-Up Conspiracy Campaign

74.   In furtherance of their conspiracy to cover-up the true facts surrounding the homicide of Jermaine McBean, Defendants and other BSO employees have committed perjury, tampered with evidence and otherwise deliberately obstructed justice.  They have intentionally and deliberately lied and omitted material facts to investigators, lied to the McBean family, lied to the media, and falsified investigative reports concerning the events preceding and attending Peraza's shooting.  The following are some of the most egregious actions taken in furtherance of this conspiracy:

**Lies About Jermaine's Actions When Peraza Shot Him**

A. Most prominent among defendants' deliberate lies is a claim that Jermaine pointed the air rifle toward the BSO officers before Peraza shot him multiple times.  Defendants well know that Jermaine was holding the unloaded air

19

rifle in such a manner, cradled in his arms behind the back of his neck, that he could not and did not in any way point it at the defendants and, indeed, could not have used it as a weapon in any way from the position in which he was carrying it at the time he was walking toward his apartment and when Peraza shot him.

Additionally, defendants well know that Peraza shot Jermaine and killed him just as Jermaine had begun to turn around to see what was happening behind him, with the unloaded air rifle still behind his head and resting across his shoulders. In his repeated public statements, Defendant Israel ignored eyewitness testimony establishing this fact and the fact that Jermaine never pointed the air rifle at anyone. Instead, Defendant Israel and his authorized spokesperson falsely advised the public through the media that Jermaine had pointed a gun at the deputies, leaving no choice but to shoot him. In addition to the eyewitness statements and other evidence, a careful analysis of the BSO officers' own statements reveals the lie:

1. In a sworn statement given at the scene, shortly after Peraza killed Jermaine, Ostroff acknowledged that Jermaine had the air rifle "**slung behind his neck with his arms over (it)**," that Jermaine just kept walking away (toward his apartment) even after one of them yelled for him to stop, noting that **it was as if Jermaine did not hear them** and that it was only as Jermaine **"began to turn around"** and **"began to face (them)"** with the front end of the unloaded air rifle coming down from behind Jermaine's neck, that he heard Peraza's shots ring out. Lt. Ostroff completely changed his "facts" in a later statement, knowingly

lying about material facts both at the scene and in the later statements.

2.   In a sworn statement given at the scene, shortly after Peraza killed Jermaine, Sgt. Lacerra said that he heard Peraza's shots that killed Jermaine at a "point and time" when he **"thought"** Jermaine **"was gonna** swing and point the (air) rifle at (them)."

3.   When Peraza gave his sworn statement the following week, with his union attorney present and ample opportunity to prepare, he first said that Jermaine "started to turn ...."  But as soon as BSO lead "investigator" Torres began leading him with his questioning to a conclusion that he felt "menaced," contrary to the accounts given by Lacerra and Ostroff and by eyewitnesses, Peraza perjuriously claimed that he shot  "as soon as (Jermaine) did turn and point his weapon at us."  Peraza falsely told another officer that Jermaine had "leveled" the "rifle" right at him before he shot.  Peraza knew this was a complete lie.

4.   In truth, of course, Peraza knew that Jermaine had not heard what the deputies had said because he had ear buds in his ears listening to loud music, and that, as the other Defendants admitted at the scene and as the objective eyewitness statements reveal, Peraza shot and killed Jermaine just as Jermaine started to turn around to see what was going on behind him.  Jermaine did not point the air rifle or anything else at Peraza or anyone else.  Indeed, just as a primary eyewitness told BSO "investigators" on the scene, the air rifle Jermaine was carrying home remained behind Jermaine's head, resting on his neck at all relevant times - including when Peraza shot and killed him.

5. The Broward County medical examiner's report from the autopsy performed on Jermaine McBean indisputably demonstrates the lie in the claim that when Peraza shot and killed Jermaine McBean, Jermaine was facing Peraza with the air rifle pointed at him.

6. The eyewitness account of a citizen who first called 911 to report seeing Jermaine walking with the air rifle who then followed Jermaine and the officers and saw the entire episode also unequivocally exposes any claim that Jermaine ever faced Peraza, ever removed the unloaded air rifle from his shoulders and behind his head as he began to turn or that he ever pointed the unloaded air rifle at Peraza or anyone else as complete lies.

**Lies Designed To Conceal Why Jermaine Never Heard The BSO Officers**

B. A second prominent lie by Defendant Peraza, Detective Torres and other BSO officers and an intentional material omission by BSO officers on a subject regarding which they had a duty to report the true relevant facts, is that Jermaine had nothing visible in his ears and specifically no ear buds in his ears at the time he was shot, and that there was no reason Jermaine would not have heard the call to drop his "weapon."

In truth, Peraza and the other BSO officers on the scene well knew that Jermaine had ear buds in his ears at all relevant times; but they concealed this fact and deliberately lied about it in an effort to hide the fact that Jermaine had the ear buds in his ears and did not hear Defendant say "Drop your weapon" or anything else immediately before Peraza shot him. Reports which BSO employees at the

22

scene knew would be relied upon in an investigation into the shooting were then falsified to conceal the true facts concerning the ear buds, and the BSO gave Jermaine's family and all others false information about the ear buds, designed to cover-up the true facts.

In furtherance of this lie designed to cover-up the facts that Jermaine never heard Peraza or any other BSO officer call out to him as he was walking home, the reason Jermaine kept walking toward his home, and, in the words of the BSO officers themselves, appeared not to hear them or appeared to ignore them, the following occurred:

1. During the week after he killed Jermaine, Peraza gave a sworn videotaped statement, with his attorney present.  In his sworn statement, Defendant Peraza committed perjury when he said that Jermaine had to have heard the deputies tell him to "drop (his) 'weapon'" because it **"didn't appear that he had anything obstructing his hearing..."** and Peraza also committed perjury when he said under oath on three more occasions during his sworn statement that **there was nothing in Jermaine's ears to inhibit his ability to hear them and, indeed, that he saw nothing whatsoever in Jermaine's ears.**

In truth Peraza saw and well knew that Jermaine had readily visible ear buds in his ears connected to his iPhone and that is why he never heard the deputies and just kept walking home.

2. Jermaine's family and friends knew that Jermaine had to have had his ear buds in at the time, as he always had them in when he walked on the street,

23

and they knew this could be the only reason that Jermaine would not have stopped
if commanded to do so.  Jermaine's mother and brothers were determined to learn
the truth of what actually happened; so they wrote to Detective Torres, the lead
"investigator" assigned by the BSO to investigate Jermaine's homicide, assuring
him that Jermaine had to have had his ear buds in and pleading with him again to
ascertain whether this was, in fact, the case.

      3.  Torres wrote back to Jermaine's mother, after purportedly
investigating the matter, assuring her without equivocation that **"[T]he deputies
who were on-scene when the shooting occurred confirmed that he did not
have anything in his ear."** [Emphasis added]  Torres falsely claimed that
Jermaine's ear buds had instead been in his pocket all along and in fact were found
there at the hospital.

      4.  At least one eyewitness expressly brought the ear phones in
Jermaine's ears to the attention of the BSO employees at the scene while Jermaine
lay on the ground bleeding with the ear phones in his ears and the wires protruding
from his ears, exclaiming that Jermaine obviously had not heard anyone tell him to
do anything because he had the ear phones in his ears.  This was intentionally
omitted from the investigative reports.

      5.  Additionally, Peraza, Lacerra, and Ostroff admitted approaching
Jermaine immediately after Peraza shot him.  Each of them clearly would have
seen and did see Jermaine's ear buds still in his ears, with the wires to the iPhone
still hanging down from them, even after Peraza shot him, as he lay bleeding to

death on the ground. Yet they each decided to lie and to conspire together to lie, even under oath, by saying that there was nothing in Jermaine's ears. They did so in order to conceal the material fact that Jermaine never had heard them calling out to him and therefore did not deliberately ignore their orders.

**The BSO "Investigation" Was A Sham Never Designed to Reveal The Truth.**

C. BSO employees charged with investigating the events surrounding Peraza's shooting of Jermaine tried to get witnesses at the scene to make false statements about the events and/or to omit from their statements a true report of the facts, in order to provide false justification for Peraza's unlawful conduct, and otherwise tried to dissuade witnesses from telling the truth about what they had observed. A proper investigation would have revealed the truth.

1. As a part of the "investigation," conducted by officers with BSO's homicide division, recorded sworn statements were taken from Lacerra, Ostroff, and Peraza following Jermaine's homicide. Lacerra's and Ostroff's statements were taken at the scene shortly after Jermaine's homicide, and Peraza's statement was taken the following week, in the presence of an attorney acting on his behalf.

2. The investigators, and Torres specifically, charged with investigating the homicide of Jermaine McBean to try to get to the true facts of what happened, instead led Lacerra, Ostroff, and Peraza through their statements, often suggesting exculpatory answers to "questions," after having prepared with them prior to starting the recording, and helped the BSO officers arrive at untruthful answers that would exculpate Defendants.

25

3.   The BSO engaged in no meaningful or effective investigation into the shooting death of Jermaine McBean.  They failed to follow up on or take any action consistent with eyewitness reports that demonstrated the unlawful nature of Jermaine's homicide and which would have exposed the cover-up.

4.   Defendant Peraza was returned to full duty with his weapon and with no meaningful further training, shortly after he killed Jermaine McBean.

5.   This reflects a pattern of conduct at the BSO and accepted practice within that agency.

6.   For example, upon information and belief, approximately 13 days before Peraza killed Jermaine, another BSO deputy killed a civilian.  That deputy was routinely returned to duty shortly after the killing, and before any grand jury investigation was even opened.   Then, upon further information and belief, approximately three weeks after Peraza killed Jermaine, that exact same BSO deputy killed another civilian.

7.   The purported investigation of the homicide of Jermaine McBean by officers with the BSO was closed without any contact with key material eyewitnesses beyond taking statements at the scene on the day Defendant Peraza killed Jermaine McBean.

8.   Statements by BSO employee witnesses, including Lacerra and Ostroff were rehearsed with Torres before they were taped.

**The BSO Produced Investigative Reports With Material Lies and Omissions.**

D.  BSO officers, including Peraza, Lacerra, Ostroff, and Torres, have an

obligation under Florida law to turn over truthful and accurate records and reports of their investigation to the State Attorney's Office, which, as they know, is charged under Florida law with conducting its own independent evaluation of the facts and presentation to a grand jury which must then decide whether to return a criminal indictment against anyone for his conduct in this case.

1.   Notwithstanding this known duty, BSO employees, including these men, provided false statements concerning the relevant facts, including false statements under oath and omitted relevant facts in the investigative file provided to the State Attorney's office in an effort to ensure that no criminal indictment would be pursued or returned and that the true facts never would be exposed

2.   Additionally, perjurious and otherwise false and misleading statements and information were provided by the BSO to the State Attorney's office concerning the circumstances surrounding the shooting of Jermaine McBean.

**Still No Grand Jury Presentment Over 21 Months After Jermaine's Homicide**

E.   Over 21 months have passed since Defendant Peraza killed Jermaine McBean; yet the case still has not been presented to a grand jury, notwithstanding the legally required duty to present the case to a grand jury.  A timely review of the documents that already have been produced as public records in this matter and a follow up with witnesses reflected in those documents would have led an investigator interested in ascertaining the truth about the homicide of Jermaine McBean to all of the facts set forth herein, including the true facts surrounding the

shooting, the ensuing perjury, and the cover-up campaign.  Instead, Peraza and the others have remained on the street and continue to serve as BSO deputies and, in the cases of Lacerra and Ostroff, as supervisors.

1.  The BSO concluded its "investigation" and turned the case over to the State's Attorney, which then purportedly opened a grand jury investigation in the case on or about August 27, 2013.

2.  However, in reality, in the more than 20 months that have passed since that date, the State Attorney's office has failed entirely to follow up with the key witnesses in the case.  Indeed, upon information and belief, it was not until March of 2015, following an inquiry by the media concerning the homicide of Jermaine McBean, that the State Attorney's office began to contact witnesses to the homicide and still such witnesses have never been called to appear before any grand jury investigating the homicide of Jermaine McBean.

3.  Meanwhile, of course, Peraza and the other BSO officers involved in the homicide and in the cover-up conspiracy have remained on duty with the BSO.

4.  This is part of a pattern and practice in Broward County, such that cases in which civilians have been killed as a result of police action, and specifically through the actions of BSO deputies, sit idle, generally for years, without being meaningfully investigated, let alone presented to a grand jury, thereby sending a message that the unlawful use of force on civilians, when committed by BSO deputies and even when it results in the death of civilians will

be tolerated and even approved and ratified.

      5.  BSO homicide Detective Torres told the McBean family that the norm in Broward County is that such cases do not go before a grand jury until "three or four years" after the death.

**Broward County Performed An Autopsy On Jermaine Without Any Notice.**

    F.  After Defendant Peraza shot and killed Jermaine, without in any way notifying Jermaine's family, let alone seeking their permission or giving them any opportunity to object , Broward County officials cut open Jermaine's body and removed his vital organs, leaving Jermaine essentially a cut-up hollow cadaver.

    No one on Jermaine's behalf, nor any party independent of Defendant Broward County was given any opportunity to participate in or observe this process or any autopsy that was performed on Jermaine's body.  Jermaine started out July 31, 2013, a living, breathing son, brother, and professional engineer; but after Peraza killed him, he was a dead, hollow cadaver, with all of his vital organs removed.

**Defendant Peraza Is Given An Award For Killing Jermaine McBean.**

    G.  On or about October 22, 2013, Defendants Israel and Broward County gave awards to each of Peraza, Lacerra, and Ostroff at the Broward Sheriff's Office Semi-Annual Awards Ceremony, giving Ostroff the "Meritorious Service Award, and Peraza and Lacerra the "prestigious" "Gold Cross Award" and announcing that these award recipients were "selected from dozens of nominees" and were being honored for their "outstanding contributions."

1.  The awards for Peraza and Lacerra, given to them less than three months after Peraza killed Jermaine McBean, and while Jermaine's homicide purportedly was still under "investigation," were expressly for their role in the events that led to Jermaine's homicide.

2.  By the date of the award ceremony, Defendants Peraza, Israel and Defendant Broward County, Florida, along with Lacerra and Ostroff well knew that less than three months earlier (1) Defendant Peraza unlawfully had killed Jermaine McBean in cold blood, (2) while Jermaine walked home with an unloaded air rifle that he was lawfully permitted to be carrying, (3) wearing ear buds at the time that restricted his ability to hear anything other than the music he was listening to, that (4) Lacerra and Ostroff acted as described above as well, and (5) that Peraza, Lacerra, and Ostroff and others all unlawfully engaged in a concerted cover-up campaign designed to conceal the true facts surrounding the homicide of Jermaine to be exposed.

3.  In a cruel and cynical irony, Defendants Israel and Broward County gave Peraza and Lacerra their awards based on their conduct that led to the killing of Jermaine McBean, a beloved, promising African-American man, at the African-American Research Library of all places.

4.  Peraza and Lacerra were given their Gold Cross awards by Defendant Israel, expressly based on their conduct in the events surrounding Peraza's shooting of Jermaine McBean.

5.  On August 23, 2013, about three weeks after Peraza killed

Jermaine and well before even the sham "investigation" by BSO was completed,
Ostroff recommended Peraza and Lacerra for their awards in a memo filled with
lies and mischaracterizations of the facts and events and a rendition of the relevant
conduct that is even directly inconsistent with Ostroff's own sworn statements at
the scene immediately after the homicide.  Peraza and Lacerra are portrayed as
heroes.

> 6. Ostroff wrote the following, *inter alia*, in recommending Peraza
and Lacerra for their awards based on their conduct surrounding the shooting
death of Jermaine McBean who was carrying an unloaded air gun on his shoulders
on his way home:

"Having been on many critical shooting incidents with (the BSO) in my 27
plus years, I can say without hesitation the actions displayed by Sergeant LaCerra
and Deputy Peraza were selfless, honorable and brave.  They placed themselves in
harms (sic) way to ensure civilians were protected regardless of the safety to
themselves.  These actions are in keeping with the highest agency standards and
based on their actions they deserve to be awarded the "Gold Cross"."

> 7. Ostroff wrote this, despite knowing that Jermaine did not actually
pose a danger to anyone, that no civilian ever was in harm's way from Jermaine,
and that Peraza actually fired at Jermaine toward the direction of civilians, missing
Jermaine entirely with at least one of his shoots.

> 8. Of course, no mention was made in Ostroff's memo that Jermaine
was not carrying a real firearm and that the air gun he was carrying was not

31

loaded.

9. Defendant Israel gave Peraza and Lacerra their awards.

**BSO Officers Know The Truth; But Not One Has Come Forward To Tell It.**

H.  Since Peraza killed Jermaine McBean over 21 months ago, not one BSO employee who knows the truth about Jermaine's homicide and the cover-up conspiracy has come forward to reveal the truth.

1. Peraza, Lacerra, Ostroff, Torres, and other BSO employees, including Defendant Israel, have known for over 21 months that at the time Defendant Peraza shot and killed Jermaine McBean, Jermaine was not carrying a weapon and posed no threat to them.

2. They well know that what Jermaine was carrying cradled behind his neck as he walked home was an unloaded air rifle, and they know that Jermaine had ear buds in his ears when the deputies came up behind Jermaine, called out to him and that Peraza shot him multiple times as he just began to turn around, with the unloaded air rifle still resting across his shoulders behind his head.

3. Defendant Peraza and Lacerra and Ostroff further know that Jermaine did not point the air rifle at any of them, and they know that he was a hard-working professional, with advanced college degrees, so beloved at his workplace that his employer offered grief counseling to his co-workers after Defendant Peraza killed him.

4. Yet not one of these men nor any other employee or representative

of the BSO has apologized to the McBean family for what Peraza did, nor acknowledged even that a mistake was made in shooting and killing Jermaine, nor in any way accepted any responsibility for this tragic, senseless, and unlawful killing.

5. Further, the BSO expressly has rejected or has ignored all of the McBean family's requests for the return of Jermaine's belongings that were taken from him following the shooting.

6. Upon information and belief, Defendants have not taken any adequate steps to ensure through better training and supervision that such a tragic incident will not be repeated. Indeed, as noted, Peraza was commended and given an award for his actions in killing Jermaine McBean in a further effort to cover up the unlawful nature of his conduct.

75. At all times relevant to this lawsuit, all defendants and all employees of the BSO were acting within the line and scope of their employment with the BSO and were acting as agents, employees, and servants of the BSO and Broward County, Florida.

76. At all times relevant to this lawsuit, Lacerra and Ostroff had supervisory authority and duties and held a higher rank with the BSO than Defendant Peraza. They acted at all times relevant to this lawsuit pursuant to such supervisory authority and higher rank; but they failed adequately and properly to supervise Defendant Peraza and these failures in the exercise of their supervisory authority and higher rank proximately and inexorably caused Jermaine's death and

his pain and suffering prior to his death.

**Jermaine's Homicide By A BSO Deputy Was A Foreseeable Consequence of**
**BSO Policy, Custom, Practice And The BSO Environment.**

77.     Broward County, the BSO, and Defendant Israel failed to adequately,
properly, and sufficiently train and supervise Peraza, Lacerra, or Ostroff and BSO
deputies generally in the use of deadly force, the use of non-deadly force as an
alternative, and more generally in how to respond properly to a situation presented
by the facts underlying this lawsuit and these failures proximately and inexorably
caused Jermaine's death and his pain and suffering prior to his death.

78.     Defendants and Lacerra and Ostroff acted at all times pursuant to a Broward
County, Florida and BSO custom, practice, policy practice, or commonly accepted
and widely known usage, including, but not limited to, (A) directing, permitting,
acquiescing in and/or ratifying, the use of deadly force in objectively unreasonable
and constitutionally impermissible circumstances, and indeed, rewarding the same,
(B) ratifying and rewarding the unlawful use of deadly force by, *inter alia*,
allowing the same to occur without discipline or further training for officers who
unlawfully use deadly force, (C) failing to adequately screen BSO deputy
candidates prior to hiring them, (D) failing to adequately train BSO deputies and
supervisors, (E) failing to adequately supervise BSO deputies, (F) failing to
dismiss BSO deputies for misconduct or malfeasance, (G) encouraging,
engendering, permitting, ratifying, and rewarding a culture and environment in
Broward County, Florida and in the BSO that discourages or penalizes employees
who expose misconduct, and especially those who expose the use of excessive

force by BSO deputies and an environment that places a higher priority on deputies' morale than on serving the public's interests and maintaining lawful conduct among BSO's employees.

79.    Such policies, practices, customs, or usages proximately caused the death of Jermaine McBean and such a homicide as occurred here should have been foreseeable to Defendants Israel and Broward County.

80.    These practices, failures, and such an environment are further encouraged, promoted, acquiesced in, and ratified by the fact that the State Attorney's office, charged with investigating claims and prosecuting charges arising from the alleged use of excessive force and shooting deaths at the hands of BSO deputies has a long and well known history of delaying any investigation into such cases and of refusing to prosecute BSO deputies based on their use of excessive force or their unlawful conduct in shooting and killing citizens.

81.    A document generated by the Broward State Attorney's Office - the so-called "Brady list" - and published in the Sun Sentinel newspaper on January 10, 2014,[1] reflects, *inter alia*, the following:

    A.  Approximately 66 BSO deputies and other employees, including supervisory personnel have been arrested for, charged with, and/or convicted of crimes that run the gamut from Armed Kidnapping, to Battery, Assault, Falsifying

---

[1]

(http://articles.sun-sentinel.com/2014-01-10/news/sfl-browards-brady-list-full-of-a ccused-cops-20140110_1_accused-cops-internal-investigation-broward-state-attor ney).

records, Official Misconduct, Narcotics trafficking, and other crimes involving dishonesty and violence.  Most of the offenses on the list occurred in the years 2012-2013.

B.  Often the cases against BSO employees are resolved by guilty pleas resulting in short or no period of incarceration and a chance for the criminal record to be cleared after a period of time.

C.  In 2013 alone, there were grand jury investigations opened against at least 16 different BSO deputies for cases in which a civilian died as a result of their actions.  There is no indication that in any of the cases from 2013 evidence actually was presented to any grand jury in a single instance of a civilian death as a result of a BSO deputy's actions.  Two grand jury investigations were opened against the same BSO deputy who, according to the "Brady list," was involved in a "police action" leading to a civilian's death 13 days before Peraza killed Jermaine and then this same deputy was involved in another "police action" leading to a civilian's death again 3 weeks after Peraza killed Jermaine.  The second death occurred before a grand jury investigation was even opened in the first civilian death case involving this BSO deputy.  No action by any grand jury concerning either of those two civilian deaths involving this same BSO deputy was indicated as of January 6, 2014.

82.    The data reflected on this "Brady list" is further evidence that the BSO, at the time Peraza killed Jermaine was and remains a law enforcement agency out of control, with major deficiencies in its policies for hiring, training, supervising, and

retaining deputies.  Such deficiencies proximately caused and foreseeably led to the unlawful homicide of Jermaine McBean by deputy Peraza.

83.    Defendants' actions as described herein violated Jermaine's rights under the Fourth and Fourteenth Amendments to the United States Constitution and similarly applicable provisions of the Florida Constitution and reflected a deliberate indifference to the need to properly train and supervise BSO officers in such situations and a deliberate indifference to Jermaine's federal and state constitutional rights.

84.    At all times relevant to this lawsuit, the law was clearly established that it was unlawful to use deadly force under the circumstances described hereinabove. Specifically, prior to July 31, 2013, it was a matter of clearly established law that a law enforcement officer could not use deadly force and shoot a citizen who was simply carrying home an unloaded air rifle which he lawfully purchased, and who posed no risk of death or serious injury to any reasonable observer, under the attending circumstances described herein.

85.    Similarly, the law was clearly established prior to July 31, 2013, that a law enforcement officer had an obligation to not be deliberately indifferent to the medical needs of a person the law enforcement officer shot and who lay bleeding and in tremendous pain, dying from the wounds inflicted on him by the law enforcement officer.

86.    Additionally, the law was clearly established prior to July 31, 2013, that a law enforcement officer has a duty to provide the facts surrounding such a

shooting in a truthful, accurate, and complete manner and to not cover-up material facts related to the shooting or commit perjury or otherwise obstruct justice or attempt to deny a victim of police misconduct from gaining access to the courts to seek justice for the violation of constitutional rights.

87.    On January 2, 2014, Defendant Sheriff Israel was sent a letter advising him that Jermaine's family intended to file a lawsuit arising from Peraza's unlawful and outrageous killing of Jermaine McBean; yet despite receiving the letter a few days later, to date, more than 16 months later, Sheriff Israel has not even so much as acknowledged the letter, let alone provided a substantive response or even an apology for this tragic loss of life through the Defendants' acts and omissions.

88.    Before taking any legal action on their own to seek redress for Peraza's unlawful killing of Jermaine McBean, Jermaine's family decided to wait patiently for the facts surrounding the homicide to be presented to a grand jury; but that never happened.  Finally, after exhaustively investigating the facts to the fullest extent their own resources would permit and waiting over 21 months to see if there would be any real investigation or effort to bring Peraza and the others to justice for their role in the homicide and deliberate delay and denial of medical care to Jermaine McBean and for their cover-up of the same, this lawsuit is being brought to try to seek some measure of justice, to hold defendants accountable for what they have done, to seek forced improvement in the hiring, retention, training, disciplining, and supervision of BSO deputies, and to try to change the culture that allows the unlawful killing of innocent, law-abiding citizens like Jermaine

McBean and the culture of lies, falsified reports, material omissions, and cover-up campaigns to go unchallenged and unpunished, and with the hope that it can help prevent other innocent civilians from being victimized by the kind of unlawful conduct described herein.

## CAUSES OF ACTION

### COUNT I
### (42 U.S.C. § 1983)

89.    Plaintiff repeats and re-alleges each of the foregoing paragraphs, incorporating them here by reference.

90.    The acts, omissions, and conduct of the defendants constituted an illegal and unconstitutional use of deadly force under the Fourth and Fourteenth Amendments to the United States Constitution.

91.    Plaintiff claims all compensable damages associated with the violations of Jermaine McBean's constitutional rights and the wrongful death of Jermaine McBean, whose death was proximately, directly, and inexorably the result of Defendants' acts and omissions.

92.    Plaintiff claims punitive damages against the individual Defendants based on their reckless, malicious, intentional, and grossly negligent conduct in conscious and callous disregard of Jermaine McBean's rights and such punitive damages are appropriate and necessary to deter and punish the Defendants.

93.    Defendants Sheriff Israel and Broward County, FL proximately caused the constitutional violations described herein by reason of their practice, policy, and

custom of failing to train and supervise their law enforcement officers, including the individual defendants, in the proper use of deadly force, of failing to discipline and fire employees who unlawfully use deadly force, and of deliberate indifference toward the same.

94.     Defendants Sheriff Israel and Broward County, FL also have failed to properly train, supervise, and discipline their law enforcement officers, including the individual defendants, in the proper response to the medical needs of a person shot by their law enforcement officers and have been deliberately indifferent to the same.  This also proximately caused the constitutional violations described herein.

95.     Defendants Sheriff Israel and Broward County, FL have filed to properly screen candidates for a position as a deputy in the BSO, and have been reckless or grossly negligent in their decisions and policies regarding the hiring, supervision, training, disciplining, and retention of deputies and supervisors employed by the BSO and this too has proximately caused the constitutional violations described herein.

96.     Defendants and others, named herein and unnamed, conspired together to engage in a cover-up and sham "investigation" as described herein and did in fact engage in such a cover-up and sham "investigation.  Such a conspiracy and sham "investigation" were intended to deny Plaintiff the right to full and free access to the courts and the right and ability to present to the courts the true facts concerning Defendants' unlawful conduct and it constituted a ratification by the Defendants Sheriff Israel and Broward County, Florida of such unlawful conduct.

97.    Allowing such a conspiracy to take place, permitting the investigation into the shooting to be a sham, giving awards to Peraza, Lacerra and Ostroff, and the failure to discipline these officers, following the unlawful use of deadly force and the conspiracy, reflects a policy, practice, and custom of Defendants Israel and Broward County, Florida, of encouraging, endorsing, ratifying, and rewarding the unconstitutional and otherwise unlawful conduct in this case.

### COUNT II
**(Conspiracy under 42 U.S.C. § 1983)**

98.    Plaintiff repeats and re-alleges each of the foregoing paragraphs, incorporating them here by reference.

99.    Defendants and others unlawfully conspired and agreed between and among themselves and with others to deny and deprive Jermaine McBean, of his constitutional rights, guaranteed to him under the laws and Constitution of the United States of America and of the State of Florida, including his rights under the Fourth and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Florida Constitution, in the manner and through the overt acts and omissions hereinabove described in detail.

### COUNT III
**(Conspiracy under 42 U.S.C. § 1985)**

100.   Plaintiff repeats and re-alleges each of the foregoing paragraphs, incorporating them here by reference.

101.   Defendants and others unlawfully conspired and agreed between and among

themselves and with others to deny and deprive Jermaine McBean, an African-American citizen, of his civil rights, guaranteed to him under the laws and Constitution of the United States of America, including the equal protection of the laws and those rights guaranteed to him and to every citizen under the Fourth and Fourteenth Amendments to the United States Constitution and under the laws and Constitution of the State of Florida, in the manner and through the overt acts and omissions hereinabove described in detail.

## COUNT IV
### (Florida State Law Claims)

102.   Plaintiff repeats and re-alleges each of the foregoing paragraphs, incorporating them here by reference.

103.   The conduct of the Defendants constituted an assault, battery, and wrongful death under the Florida Constitution and the laws of the State of Florida and Plaintiff seeks compensatory damages for the same against the Defendants.

104.   A Notice of Claim was duly presented by Plaintiff under FL. St. § 768.28, with such Notice of Claim presented on or about January 2, 2014 and received on or about January 6, 2014.  No response ever has been provided to the Notice of Claim.  All Florida state law conditions precedent to filing this action have been satisfied.

## CLAIM FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

1.   Award Plaintiff compensatory damages against all Defendants in an amount

to be proved at trial as compensation for the horrific pain, suffering, agony, fear, apprehension, deliberate indifference to his medical needs, and ultimately for the tragic death of Jermaine McBean, and all other compensable injuries, through the Defendants' unlawful actions in violation of his federal and state constitutional rights and his rights under Florida state law.

2.    Award Plaintiff punitive damages against the individual defendants on the claims brought under federal law, in an amount designed to punish Defendants for their conduct and to deter such conduct in the future.

3.    Declare Defendants' actions and the actions of other BSO employees in connection with the killing of Jermaine McBean, which caused him excruciating pain and suffering and fear prior to his death, the deliberate denial of his medical needs, and the cover-up of the same, as well as the failure to properly hire and adequately screen, train, discipline, and supervise BSO deputies and officers to be unlawful and in violation of Jermaine McBean's civil rights as protected by the laws and Constitutions of the United States of America and the State of Florida;

4.    Enjoin Defendants Sheriff Scott Israel and Broward County, Florida to (1) research, develop, and implement improved, appropriate systems and practices for the training and supervision of BSO employees, especially with respect to their use of deadly force, (2) retain an outside party or agency, agreeable to the Plaintiff to receive reports on, have the authority to investigate and take action upon, and to monitor and record all claims of the use of excessive force by a BSO employee, and (3) retain an independent outside law enforcement expert agreed upon as such

by the Plaintiff, to oversee the development and implementation of the systems

and practices referred to herein.

5.      Award Plaintiff reasonable attorneys' fees and costs of this action;

6.      Grant Plaintiff such other and further relief as this Court deems just and

equitable.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all claims.

Respectfully Submitted.

_____
/s/ David I. Schoen
Counsel for Plaintiff
(*Pro Hac Vice* Application Pending)

David I. Schoen
Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone:  334-395-6611
Facsimile: 917-591-7586
E-Mail: DSchoen593@aol.com

_____
/s/ Eric Bluestein
Counsel for Plaintiff
Florida Bar # 58240

Law Offices of Eric Bluestein, P.A.
2665 S. Bayshore Drive, Suite 609
Miami, Florida 33133
Telephone: 305-371-2692
Facsimile: 305-371-2691
E-Mail: Eric@EricBluestein.com